# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3904-23

O.D.,[1]

    Plaintiff-Respondent,

v.

J.S.,

    Defendant-Appellant.

_____

        Submitted March 10, 2026 – Decided March 18, 2026

        Before Judges Firko and Perez Friscia.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-2302-24.

        Robert C. Pierce, attorney for appellant.

        Pescatore & Sauter, LLC, attorneys for respondent (Amy L. Sauter, on the brief).

PER CURIAM

---

[1] We use initials and a pseudonym to protect the parties' privacy and the confidentiality of these proceedings. R. 1:38-3(d)(10).

Defendant J.S. appeals from the June 28, 2024 final restraining order (FRO) entered against him in favor of plaintiff O.D. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, based on the predicate acts of stalking, N.J.S.A. 2C:12-10.1, and harassment, N.J.S.A. 2C:33-4(c).[2] The Family Part judge determined an FRO was necessary to protect plaintiff from future acts of domestic violence. Defendant also appeals from an October 1, 2024 order awarding plaintiff counsel fees in the amount of $16,327.50. Because we find no reason to disturb the judge's findings, we affirm both orders.

I.

The facts were established at the four-day hearing conducted in March, May, and June 2024. Both parties were represented by counsel. Plaintiff and four police officers, K.D., F.C., A.B., and L.C., testified on her behalf. Defendant testified on his own behalf and presented testimony from an employee, R.B., from Batesville Casket Company and his neighbor, F.M. Defendant owns funeral homes in Passaic and Brooklyn, New York. Maps,

---

[2] The June 28, 2024 FRO also states it was granted on the grounds of assault. The judge made no findings on the predicate act of assault. We therefore limit our discussion to the predicate acts of stalking and harassment.

A-3904-23

photographs, copies of the restraining orders, text messages, an email, an air waybill, surveillance video, and status manifests were moved into evidence.

The parties dated from approximately 2015 until October 2022 but never married. They have a seven-year-old child in common, "James." Plaintiff also has a child from a previous relationship. In the Fall of 2022, the parties ceased romantic relations, and defendant began sleeping in the basement of their Nutley home, which they purchased together. The parties continued to reside there until October 9, 2023.

On June 7, 2023, following an argument, plaintiff testified defendant forced his way into her locked bedroom using a screwdriver, grabbed her, and pinned her down to the point she could not breathe. As a result, plaintiff sustained injuries to her arms and legs as depicted in the photographs moved into evidence. Plaintiff testified that during this incident, defendant took her cell phone and placed it in the ceiling beyond her reach. Plaintiff was able to communicate with a friend from her laptop, and the police were called. Defendant admitted at trial that he opened the locked door with a screwdriver and took plaintiff's cell phone.

On September 8, 2023, defendant confronted plaintiff regarding her whereabouts in Brooklyn after discovering a parking ticket was issued to her.

3

Plaintiff testified the ticket was placed in her car and purse, and defendant could have only known about it by searching her property. Defendant sent plaintiff a text message asking if she had been in Brooklyn on a given date and requested information about her whereabouts. Plaintiff responded she was in Brooklyn but for work-related reasons, and it was none of defendant's business why she was there. Defendant sent plaintiff a picture of the parking ticket she received to demonstrate he knew she was in Brooklyn and that he saw her with another man, which caused her to be "very scared."

On October 2, 2023, the parties got into an argument about who was going to walk their dog. Plaintiff began to walk the dog, and defendant followed her out of the house, leaving the children alone. Plaintiff tried to run away from defendant, but he chased her. Plaintiff described defendant's behavior as "very absurd," and defendant did not stop chasing her until she called her mother for help.

Later that evening, defendant entered her bedroom to use the bathroom to take a shower despite having a bathroom in the basement. After he showered, plaintiff locked her bedroom door. Defendant then banged on the door, threw a sock in plaintiff's face, and yelled at her not to ignore him. Afterwards, plaintiff

4

sent defendant a text message about his behavior, and he denied the incident ever happened and claimed he was not home at the time.

On October 6, 2023, one year after the end of their romantic relationship, plaintiff testified defendant "stalked and harassed" her at a Red Roof Inn. According to plaintiff, defendant appeared in the parking lot and parked behind her vehicle to block her from leaving. Defendant opened plaintiff's car door and threatened to tell her family and friends where he found her and what he believed she was doing there. Plaintiff testified defendant would not allow her to leave until she explained why she was at the hotel, but she refused. Plaintiff played a video of the incident at trial, which was captured on a police body worn camera and confirmed defendant's presence at the hotel.

Plaintiff testified the parties exchanged text messages about the incident. Defendant denied being at the hotel and texted plaintiff that she was going "crazy." Plaintiff later learned that defendant installed an app on James's iPad to monitor his location. Defendant claimed he only went to the hotel because, using the app, he noticed James was in Secaucus, which was "unusual." Defendant tracked James to the hotel's parking lot where plaintiff also was. Plaintiff testified in another text message defendant informed her that "it would be in her best interest to get along with him and to just play it cool."

5

As a result of these incidents, plaintiff sought and was granted a temporary restraining order (TRO) against defendant on October 9, 2023, which was amended on October 17, 2023. After the TRO was served, defendant moved out of the parties' home but used a mobile device to remotely activate plaintiff's ADT alarm system on October 13 and November 2, 2023, at 3:00 a.m., causing her fear and anxiety. Regarding the October 13 incident, plaintiff testified she was alone when defendant tampered with the alarm, which made her feel "very uneasy" and "very fearful." At trial, defendant admitted that he activated the alarm. The incident was reported to Officer L.C. At that time, defendant was charged with contempt for violating the TRO and harassment.

Plaintiff agreed to dismiss the TRO in exchange for the entry of a consent order providing for civil restraints. The consent order, entered on December 5, 2023, specifically stated that defendant agreed not to stalk or harass plaintiff. The parties agreed to co-parent only using Our Family Wizard. The parties also agreed that plaintiff would purchase defendant's interest in their home for $100,000 in two payments of $50,000 due on January 1, 2024, and January 1, 2025. Plaintiff was to have exclusive possession of the residence. Defendant testified that plaintiff did not meet the first payment deadline.

6

Notwithstanding the terms of the consent order, on January 3, 2024, defendant tracked and followed plaintiff to a Hampton Inn. Plaintiff stated defendant's actions caused her "fear," and she was "intimidated" by him. Plaintiff went to the local police station and observed defendant had parked his vehicle behind her in the parking lot. Surveillance cameras captured defendant's presence at the police station, and criminal charges were filed.

Defendant countered he had a reason to be in those locations because after delivering the remains of a body at Newark Liberty International Airport, he drove to Batesville Casket Company in Moonachie to pick up a coffin. Defendant testified he got lost in East Rutherford and drove into the Hampton Inn parking lot when he saw plaintiff's vehicle. At 1:15 p.m., he arrived at Batesville Casket Company, as confirmed by employee R.B.'s testimony. Defendant claimed the encounter at the Hampton Inn and the police station were "coincidences."

Plaintiff testified the stalking and harassing incidents were the result of her starting to date other people, which defendant expressed to her. Police officer K.D. testified about the January 3, 2024 incident and plaintiff's report of what happened. Officer F.C. testified about the same incident and authenticated the surveillance video that showed where the parties' vehicles were parked and

a man that matched plaintiff's description of defendant. Officer F.C. testified plaintiff's demeanor was "upset and scared."

Police officer A.B. testified about his investigation of the November 2, 2023 alarm incident. Officer A.B. contacted ADT Alarm Company and learned the alarm was set off remotely by defendant using the ADP phone app. As a result of this information, Officer A.B. testified defendant was charged with contempt of the TRO and harassment.

Police officer L.C. testified about his investigation of the October 13, 2023 alarm incident. Officer L.C. testified plaintiff reported she did not activate the alarm but believed defendant had done so because he had remote access.

Plaintiff testified she needed an FRO because she felt "scared" and believed defendant was "incapable of adhering to any of the restraints" lodged against him. Plaintiff explained that defendant "does [not] respect any sort of boundaries and uses all . . . forms of stalking, harassment, [and] manipulation . . . to hurt [her] in any way he can." Defendant testified he did not harass or stalk plaintiff, and their "contretemps [were] fueled by competing views on how to raise [James]."

The parties' neighbor, F.M., testified that he witnessed their garage door being left open on October 19, 2023, at 11:45 p.m. and immediately reported it

A-3904-23

to defendant. According to defendant, F.M.'s testimony was relevant to show he activated the alarm because "he was concerned with the safety of his son." The judge found F.M. "credible" but "discount[ed]" his testimony because the October 19, 2023 incident was not referenced in the amended TRO and occurred after defendant set off the alarm on October 13, 2023.

In her comprehensive oral decision, the judge determined jurisdiction was established under the PDVA because the parties dated, were former household members, and have a child in common. The judge found plaintiff's testimony was "credible" and "consistent," and plaintiff comported herself, sometimes emotionally, in an appropriate manner maintaining "good eye contact" throughout. The judge noted plaintiff was "extremely respectful" to the court. Overall, the judge observed plaintiff was "not evasive at all" in answering questions. The judge found plaintiff was not seeking an FRO "to get money or . . . to stop paying defendant" for his share of their former home. Instead, the judge reasoned plaintiff is seeking an FRO because she wants "to be left alone" by defendant.

The judge found defendant was incredulous when he testified it was merely a "coincidence" to find plaintiff at two different hotels and at the police station in a different vehicle with different clothing on when plaintiff attempted

9

to report the incident to the police. The judge noted defendant's testimony "did not make any sense." The judge rejected defendant's testimony that he was worried about James because he was with plaintiff at the hotel. The judge stated "whatever [plaintiff] does with her son is her business" because she was the parent in control at the time. The judge emphasized defendant's behavior was "outrageous," and consequently, plaintiff's fear was "understandable." The judge highlighted that defendant used "constant mind manipulation," and his responses were "classic telltale signs of the definition of gaslighting," because he tried to make plaintiff think she was "crazy" or making things up.

The judge determined the police officers were "very credible." The judge noted Officer K.D. "just stuck to the facts," did not know the parties, had no "bias", and "just reported what he saw." The judge credited Officer K.D.'s testimony that plaintiff "showed emotions of being upset and scared." The judge observed Officer L.C. had no "ulterior motive in this case," did not "embellish" his testimony, and "just answered questions." The judge determined Officer A.B. was "very credible" and testified plaintiff informed him defendant caused the alarm to go off, resulting in a violation of the TRO and the contempt charge.

The judge found plaintiff proved the predicate act of stalking because defendant, absent any communication from plaintiff, showed up at two different

hotel parking lots on two separate occasions. The judge determined these two instances were not coincidences, and plaintiff was "shocked" and "frightened" by defendant's actions.

The judge also determined plaintiff proved the predicate act of harassment based on these same events. The judge reasoned that the placement of the tracking app on James's iPad was "outrageous" and meant to be "deceitful" as part of defendant's "ulterior motive." The judge analyzed subsection (c) of the harassment statute, N.J.S.A. 2C:33-4, in making her findings of fact and conclusions of law and found plaintiff proved defendant committed harassment under that subsection. The judge noted plaintiff did not prove subsections (a) or (b) of the harassment statute.

Finally, the judge found that plaintiff needed an FRO. In doing so, the judge credited plaintiff's testimony that she is afraid of defendant. The judge analyzed both Silver[3] prongs, the seven statutory factors under N.J.S.A. 2C:25-29(a), and recognized plaintiff's need for an FRO. The judge considered the history of domestic violence and prior TRO between the parties and the need to protect plaintiff from further abuse. The judge determined there is "obvious

---

[3] Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006).

immediate danger" to plaintiff given her finding that defendant's "conduct is go[ing] to continue," and defendant will continue to use James as "the motive of having to know where . . . [p]laintiff is at all times."

The judge also granted plaintiff's request for counsel fees pursuant to N.J.S.A. 2C:25-29(b)(4).[4] Plaintiff's counsel filed a certification of services, and defendant filed opposition, and plaintiff filed a reply to defendant's

---

[4] N.J.S.A. 2C:25-29(b)(4) provides:

> An order requiring the defendant to pay to the victim monetary compensation for losses suffered as a direct result of the act of domestic violence. The order may require the defendant to pay the victim directly, to reimburse the Victims of Crime Compensation Office for any and all compensation paid by the Victims of Crime Compensation Office directly to or on behalf of the victim, and may require that the defendant reimburse any parties that may have compensated the victim, as the [c]ourt may determine. Compensatory losses shall include, but not be limited to, loss of earnings or other support, including child or spousal support, out-of-pocket losses for injuries sustained, cost of repair or replacement of real or personal property damaged or destroyed or taken by the defendant, cost of counseling for the victim, moving or other travel expenses, reasonable attorney's fees, [c]ourt costs, and compensation for pain and suffering. Where appropriate, punitive damages may be awarded in addition to compensatory damages.

opposition. The judge awarded plaintiff attorney's fees in the amount of $16,327.50, in accordance with N.J.S.A. 2C:25-29(b)(4) and RPC 1.5(a). This appeal followed.

Before us, defendant argues:

(1) the entry of the FRO was based on the judge's erroneous "all-or-nothing" approach to fact-finding and decision-making warranting reversal;

(2) the predicate act findings were inadequate and insufficiently supported;

(3) the need for an FRO was insufficiently established; and

(4) the order awarding fees should be vacated.

II.

Generally, "findings by a trial court are binding on appeal when supported by adequate, substantial, [and] credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of

credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

We will not disturb a trial court's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). However, we do not accord such deference to legal conclusions and will review such conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. Consequently, "[o]ur law is particularly solicitous of victims of domestic violence." J.D., 207 N.J. at 473 (alteration in original) (quoting State v. Hoffman, 149 N.J. 564, 584 (1997)). Therefore, courts will "liberally construe[] [the PDVA] to achieve its salutary purposes." Cesare, 154 N.J. at 400.

When determining whether to grant an FRO pursuant to the PDVA, the judge must make two determinations. See Silver, 387 N.J. Super. at 125-27.

Under the first prong of Silver, "the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)).

If the court finds the defendant committed a predicate act of domestic violence, then the second inquiry under Silver "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126. While the second prong inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)][(7)], to protect the victim from an immediate danger or to prevent further abuse." Id. at 127.

"[T]he Legislature did not intend that the commission of one of the enumerated predicate acts of domestic violence automatically mandates the entry of a domestic violence restraining order." Id. at 126-27. The factors which the court should consider include, but are not limited to:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;

A-3904-23

(3) The financial circumstances of the plaintiff and defendant;

(4) The best interests of the victim and any child;

(5) In determining custody and parenting time the protection of the victim's safety;

(6) The existence of a verifiable order of protection from another jurisdiction; and

(7) Any pattern of coercive control against a person that in purpose or effect unreasonably interferes with, threatens, or exploits a person's liberty, freedom, bodily integrity, or human rights with the court specifically considering evidence of the need for protection from immediate danger or the prevention of further abuse. If the court finds that one or more factors of coercive control are more or less relevant than others, the court shall make specific written findings of fact and conclusions of law on the reasons why the court reached that conclusion. Coercive control may include, but shall not be limited to:

> (a) isolating the person from friends, relatives, transportation, medical care, or other source of support;
> (b) depriving the person of basic necessities;
>
> (c) monitoring the person's movements, communications, daily behavior, finances, economic resources, or access to services;
>
> (d) compelling the person by force, threat, or intimidation, including, but not limited to, threats based on actual or suspected immigration status;

16

(e) threatening to make or making baseless reports to the police, courts, [DCPP] within the Department of Children and Families, the Board of Social Services, Immigration and Customs Enforcement (ICE), or other parties;

(f) threatening to harm or kill the individual's relative or pet;

(g) threatening to deny or interfere with an individual's custody or parenting time, other than through enforcement of a valid custody arrangement or court order pursuant to current law including, but not limited to, an order issued pursuant to Title 9 of the Revised Statutes; or

(h) any other factors or circumstances that the court deems relevant or material.

[N.J.S.A. 2C:25-29(a).]

Although the court is not required to incorporate all of these factors in its findings, "the [PDVA] does require that 'acts claimed by a plaintiff to be domestic violence . . . be evaluated in light of the previous history of violence between the parties.'" Cesare, 154 N.J. at 402 (quoting Peranio v. Peranio, 280 N.J. Super. 47, 54 (App. Div. 1995)). Whether a restraining order should be issued depends on the seriousness of the predicate offense, on "the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment, and physical abuse," and on "whether immediate

danger to the person or property is present." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995).

The court must also exercise care to "distinguish between ordinary disputes and disagreements between family members and those acts that cross the line into domestic violence." R.G. v. R.G., 449 N.J. Super. 208, 225 (App. Div. 2017). The PDVA is not intended to encompass "ordinary domestic contretemps." Corrente, 281 N.J. Super. at 250. Rather, "[t]he [PDVA] is intended to assist those who are truly the victims of domestic violence." Silver, 387 N.J. Super. at 124 (quoting Kamen v. Egan, 322 N.J. Super. 222, 229 (App. Div. 1999)). The second prong of Silver "requires the conduct must [be] imbued by a desire to abuse or control the victim." R.G., 449 N.J. Super. at 228 (citing Silver, 387 N.J. Super. at 126-27).

## III.

Defendant argues the judge's reference to an "all-or-nothing docket," where there are "no hybrids" and "no halfway points" warrants reversal of the FRO. Defendant maintains he was already the subject of civil restraints under the consent order, and the judge could have found he violated its terms and granted relief pursuant to Rule 1:10-3, enforcement of litigant's rights, without

A-3904-23

finding PDVA predicate acts or the need for an FRO. We reject defendant's arguments.

We have no reason to disturb the findings made by the judge. Her decision was based upon substantial credible evidence in the record. Gnall, 222 N.J. at 428. The judge had the opportunity to observe the parties and witnesses and determine their credibility. The judge found plaintiff's version of events was credible and corroborated by the evidence. Defendant's contrary testimony was clearly not deemed credible. Accordingly, we defer to the judge's factual findings. Cesare, 154 N.J. at 411-12.

Defendant fails to cite any legal authority to support his position that instead of entering an FRO, the judge should have held him in violation of litigant's rights under Rule 1:10-3. We note the consent order was entered under a non-dissolution docket number (FD), and therefore, was not under the jurisdiction of the PDVA. After a thorough review of the record, we are satisfied that the judge's findings meet the criteria under the PDVA.

IV.

Next, defendant contends the predicate act findings were inadequate and insufficiently supported. We address each in turn.

A.

Stalking

A person is guilty of stalking "if he [or she] purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his [or her] safety or the safety of a third person or suffer other emotional distress." N.J.S.A. 2C:12-10(b). N.J.S.A. 2C:12-10(a)(1) further defines that:

> "Course of conduct" means repeatedly maintaining a visual or physical proximity to a person; directly, indirectly, or through third parties, by any action, method, device, or means, following, monitoring, observing, surveilling, threatening, or communicating to or about, a person, or interfering with a person's property; repeatedly committing harassment against a person; or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct or a combination thereof directed at or toward a person.

In State v. Ghandi, our Supreme Court held "that the Legislature intended to cast a wide net of protection for stalking victims by broadly prohibiting and punishing persistent, unwanted, and frightening behaviors." 201 N.J. 161, 187 (2010). The anti-stalking statute was implemented "to intervene in repetitive harassing or threatening behavior before the victim has actually been physically attacked." H.E.S. v. J.C.S., 175 N.J. 309, 329 (2003) (quoting State v. Saunders,

20

302 N.J. Super. 509, 520 (App. Div. 1997)). Therefore, "acts of actual violence are not required to support a finding of domestic violence." Ibid. Granting an FRO to a victim of stalking "furthers the . . . [PDVA's] goal of 'assur[ing] the victims of domestic violence the maximum protection from abuse the law can provide.'" Ibid. (alteration in original) (quoting Cesare, 154 N.J. at 399).

Guided by the law and our standard of review, we conclude the judge did not err in finding defendant committed the predicate act of stalking. The uncontroverted evidence showed defendant tracked plaintiff to two different hotel parking lots on two separate occasions and followed her to the police station after he tracked her to the Hampton Inn. The stalking statute defines "[r]epeatedly" as "on two or more occasions," "[e]motional distress" as "significant mental suffering or distress;" and "[c]ause a reasonable person to fear" as "to cause fear in which a reasonable victim, similarly situated, would have under the circumstances."

We perceive no misuse of discretion in the judge's finding defendant engaged in stalking, given the ample credible evidence in the record. The judge found plaintiff's testimony—which we have described in detail—credible and deemed defendant's denials not credible. Giving deference to those findings, plaintiff's testimony was sufficient to establish that defendant physically stalked

21

her at the two hotels on two separate occasions and at the police station parking lot.

The judge recounted and accepted plaintiff's testimony that defendant's actions put her in reasonable fear and noted defendant gaslighted her by calling plaintiff "crazy" and accusing her of making up stories. The judge reviewed the evidence as a whole and properly concluded the manner and substance of defendant's statements, text messages, placement of the app on James's iPad without informing plaintiff, monitoring her, and showing up at the hotels and police station demonstrated he purposely or knowingly engaged in repeated conduct that would evoke fear in a reasonable person.

B.

Harassment

Defendant argues the judge misapplied the law in determining he committed harassment under subsection (c).

N.J.S.A. 2C:33-4 defines harassment as:

> Except as provided in subsection e., a person commits a petty disorderly persons offense if, with purpose to harass another, he:
>
> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;

b.  Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

c.  Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

A communication under subsection a. may be deemed to have been made either at the place where it originated or at the place where it was received.

A finding of harassment requires proof of an intent or purpose to harass. Hoffman, 149 N.J. at 576-77.  A purpose to harass may be inferred from the evidence.  State v. McDougald, 120 N.J. 523, 566-67 (1990).  An assertion by a plaintiff that he or she felt harassed is a subjective belief and insufficient to prove a purpose or intent to harass.  J.D., 207 N.J. at 487.  A violation of N.J.S.A. 2C:33-4(c), by contrast, requires proof of a course of conduct.  Id. at 478. Common sense and experience may also inform a determination or finding of purpose.  Hoffman, 149 N.J. at 577 (citing State v. Richards, 155 N.J. Super. 106, 118 (App. Div. 1978)).  "[T]he decision about whether a particular series of events rises to the level of harassment or not is fact-sensitive."  J.D., 207 N.J. at 484.

As stated, the judge found plaintiff established the predicate act of harassment based on defendant tracking her to two different hotel parking lots

on two separate occasions. Moreover, defendant followed plaintiff to the police station in January 3, 2024, after he tracked her to the Hampton Inn. The judge disbelieved defendant's explanation for his conduct and found he had no valid reason to be at the police station. This finding is sufficiently anchored in plaintiff's and the officers' testimony. We are unpersuaded by defendant's argument the judge should have given more weight to R.B.'s testimony corroborating that defendant was working with him on January 3, 2024.

The judge properly assessed the "surrounding circumstances," which further evidenced the requisite intent. R.G., 449 N.J. Super. at 226 (quoting State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006)). The judge reasoned that defendant's prior act of blocking plaintiff in at the Red Roof Inn was designed to "harass" and "vex" her, and his denying being there was the very definition of gaslighting. Moreover, the judge found defendant's failure to inform plaintiff he placed a tracking app on James's iPad was "outrageous" and "deceitful."

Having determined the judge found both predicate acts and deferring to her credibility assessments, we reject defendant's challenge to the judge's conclusion that the FRO was necessary to protect plaintiff under prong two of Silver. The judge found plaintiff was in immediate danger because if the FRO

24

was not entered, defendant's "conduct is going to continue." Further, the judge explained the parties' financial circumstances are "interrelated at this point," and the business of plaintiff buying out defendant's share of the home has not been completed, so there is "a chance of further acrimony." The judge highlighted the prior history of domestic violence and noted features of defendant's coercive control over plaintiff. Therefore, we will not disturb the judge's reasoned decision.

V.

We have also carefully reviewed defendant's challenge to the judge's granting counsel fees and perceive no error. When a victim demonstrates that attorney's fees "are a direct result of the domestic violence, they are reasonable, and they are presented by affidavit [or certification] pursuant to Rule 4:42-9(b)," the trial court may award attorney's fees as compensatory losses under N.J.S.A. 2C:25-29(b)(4). Grandovic v. Labrie, 348 N.J. Super. 193, 196 (App. Div. 2002). We accord substantial deference to a trial judge's assessment of counsel fees and that determination "'will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion.'" McGowan v. O'Rourke, 391 N.J. Super. 502, 508 (App. Div. 2007) (quoting Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001)). "It would be inimical to the [PDVA] to

25

deny a victim an award of reasonable attorney's fees and costs incurred in successfully defending against a challenge to a[n FRO] . . . ."  Grandovic, 348 N.J. Super. at 197.

The PDVA provides for attorney's fees "to avoid a chilling effect on the willingness of domestic violence victims to come forward with their complaints."  M.W. v. R.L., 286 N.J. Super. 408, 411 (App. Div. 1995).  If, after considering the factors of Rule 4:42-9(b) and RPC 1.5(a)(1) to (8), "the court finds that the domestic violence victim's attorney's fees are reasonable, and they are incurred as a direct result of domestic violence, then a court, in an exercise of its discretion, may award those fees."  McGowan, 391 N.J. Super. at 508.

Because fees and costs in a domestic violence action are awarded as damages, they are "not subject to the traditional analysis" for an award of fees in family-type claims pursuant to N.J.S.A. 2A:34-23, and the court is not obliged to consider the parties' financial circumstances.  Id. at 507 (quoting Schmidt v. Schmidt, 262 N.J. Super. 451, 454 (Ch. Div. 1992)).

The judge's thorough written opinion found plaintiff was a victim of domestic violence entitled to compensatory damages and concluded the fee application to be properly supported by a certification of services.  See R. 4:42-

9(b). The judge addressed the application, considering in detail each of RPC 1.5(a)'s factors in granting the award. The judge did not misuse her discretion.

To the extent we have not specifically addressed defendant's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

27                                                    A-3904-23